## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION - DAYTON

**AMANDA MCALEER, M.D.**
**201 Evergreen Dr.**
**Bellefontaine, Ohio 43311**

       Plaintiff,

vs.

**THE SHELBY COUNTY MEMORIAL**
**HOSPITAL ASSOCIATION DBA**
**WILSON HEALTH DBA WILSON**
**MEMORIAL HOSPITAL**
**915 West Michigan Street**
**Sidney, Ohio 45365**
    and
c/o Stanley R. Evans, Registered Agent
**100 South Main Street, Suite 102**
**Sidney, Ohio 45365**

and

**ERIC PRENGER, M.D.**
**Individually and in his Official Capacity**
**915 West Michigan Street**
**Sidney, Ohio 45365**

and

**MICHAEL TRYGSTAD, M.D.**
**Individually and in his Official Capacity**
**915 West Michigan Street**
**Sidney, Ohio 45365**

and

CASE NO. 3:21-cv-70 _____

JUDGE Michael J. Newman _____

**JURY DEMAND ENDORSED HEREON**

**ROBERT MCDEVITT, JR., M.D.**
**Individually and in his Official Capacity**
**915 West Michigan Street**
**Sidney, Ohio 45365**

and

**CARRIE HUBER, M.D.**
**Individually and in her Official Capacity**
**915 West Michigan Street**
**Sidney, Ohio 45365**

      **Defendants.**

---

## COMPLAINT

---

Now comes Plaintiff, Amanda McAleer, M.D., by and through the undersigned counsel, who hereby alleges and asserts against Defendants as follows:

I.    **PARTIES**

1.    Plaintiff, Amanda McAleer, M.D. ("Dr. McAleer"), is a resident of the State of Ohio and an OB/GYN physician employed by the Wilson Health Medical Group with privileges at The Shelby County Memorial Hospital Association d/b/a Wilson Health d/b/a Wilson Memorial Hospital.

2.    Defendant, The Shelby County Memorial Hospital Association d/b/a Wilson Health d/b/a Wilson Memorial Hospital ("Wilson Health"), is an independent community hospital and Ohio non-profit corporation with a principal place of business at 915 West Michigan Street, Sidney, Ohio 45365. Wilson Health maintains a number of committees relevant to its

2

3.  administration and the actions herein, including the Medical Executive Committee ("MEC") and the Medical Peer Review Committee ("MPRC").

4.  Defendant, Eric Prenger, M.D. ("Dr. Prenger"), is a resident of the State of Ohio, a physician at Wilson Health, the Chief of Staff of Wilson Health, and the Chair of the MEC. He is being sued both as an individual and in his official capacity.

5.  Defendant, Michael Trygstad, D.O. ("Dr. Trygstad"), is a resident of the State of Ohio, a physician with Wilson Health, Chair of the Wilson Health Medical Group Peer Review Committee, and, at all times relevant herein, was the interim Chief Medical Officer of Wilson Health, a member of the MEC, and a member of the MPRC. He is being sued both as an individual and in his official capacity.

6.  Defendant, Robert McDevitt, Jr., M.D. ("Dr. McDevitt"), is a resident of the State of Ohio, a physician with Wilson Health, and at all time relevant herein was a voting member of the MEC and a member of the MEC Investigative Subcommittee. He is being sued both as an individual and in his official capacity.

7.  Defendant, Carrie Huber, M.D. ("Dr. Huber"), is a resident of the State of Ohio and, at all times relevant herein, was an OB/GYN physician at Wilson Health Medical Group with privileges at Wilson Health, the Chair of the MPRC, and a voting member of the MEC. She is being sued both as an individual and in her official capacity.

## II.  JURISDICTION AND VENUE

8.  Plaintiff incorporates each of the proceeding allegations within this Count by reference.

9.  This Court has federal jurisdiction pursuant to 15 U.S.C. § 1 of the Sherman Act, 15 U.S.C. § 4 of the Clayton Act, 18 U.S.C. §§ 1342, 1962, and 1964, and 42 U.S.C. §§ 11101-11152 of the Health Care Quality Improvement Act of 1986 ("HCQIA").

10.   This Court has subject matter jurisdiction is established over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1337.

11.   This Court has supplemental or pendent jurisdiction of the remaining claims in this action pursuant to 28 U.S.C. § 1367(a) as said claims are so related to the original jurisdiction claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.   Venue is proper in the United States District Court for the Southern District of Ohio, Western Division in Dayton, Ohio, pursuant to 28 U.S.C. § 1391 as the conduct giving rise to the causes of action occurred in Shelby County, Ohio and/or some or all of the Defendants reside in the district, transact affairs in this district, and/or conduct a substantial amount of business in this district.

**III.    FACTS COMMON TO ALL CLAIMS**

13.   Plaintiff incorporates each of the proceeding allegations within this Count by reference.

14.   Dr. McAleer graduated from Northeastern Ohio University College of Medicine in 2007.

15.   After graduation, Dr. McAleer completed her residency at Riverside Methodist Hospital and became a board-certified OB/GYN.

16.   Dr. McAleer began her medical career in 2011 as a junior partner at a private medical practice in Conway, South Caroline.

17.   In 2014, she left her practice in Conway and joined a hospital-owned OB/GYN practice at Mary Rutan Hospital in Bellefontaine, Ohio, where she became the Department Chair of the OB/GYN group within a matter of months.

18.   Seeking a better work/life balance, Dr. McAleer accepted an OB/GYN position with Wilson Care, LLC d/b/a Wilson Health Medical Group ("WHMG"), a medical practice

4

affiliated with Wilson Health composed of over 30 physicians and nurse practitioners across a broad spectrum of specialties.

19. Prior to starting work at WHMG on January 2, 2019, Dr. McAleer was appointed to the Wilson Health medical staff and granted privileges at Wilson Health based upon her employment with WHMG.

## THE ORIGINS OF CONFLICT WITH DR. HUBER AND WILSON HEALTH

20. For the next eight months Dr. McAleer worked at WHMG and exercised her privileges at Wilson Health without incident.

21. This all changed after Dr. McAleer had a run in with Dr. Huber, one of her partners in the WHMG OB/GYN practice, as well as the Chair of the MPRC and a voting member of the MEC during all times relevant herein.

22. On August 22, 2019, Dr. McAleer took a vacation day, which required Dr. Huber to cover for her at Wilson Health.

23. Dr. Huber became personally offended when she discovered that Dr. McAleer was working a previously scheduled *locums* job at Lima Memorial Hospital on her vacation day.

24. Dr. Huber left several angry and unprofessional messages that same evening for Dr. McAleer at Lima Memorial Hospital and at the Lima OB/GYN private practice's messaging service demanding to speak to Dr. McAleer but refusing to divulge what the call was regarding.

25. Dr. McAleer called the Lima OB/GYN private practice she was covering for and apologized for Dr. Huber's extremely embarrassing and unprofessional calls.

26.     Dr. McAleer received a third call later that night from the Lima OB/GYN private practice's messaging service from an alleged patient indicating that Dr. McAleer had seen her in the Lima office.

27.     Dr. McAleer was immediately suspicious of the veracity of this alleged patient message as she only covered calls for the Lima private practice and had never seen patients in the office on their behalf.

28.     Dr. McAleer called the so-called "patient" back, listened to her alleged medical issue, and provided medical advice.

29.     Dr. McAleer later discovered that the phone call from the so-called "patient" was fraudulent and was made from a cell phone connected to Christa Meyer ("Meyer"), the office manager for the WHMG OB/GYN practice and a close personal friend of Dr. Huber.

30.     After completing her *locums* work, Dr. McAleer returned to work at WHMG on August 26, 2019 and attended a lunchtime provider meeting with the other physicians in her practice.

31.     The issue of Dr. McAleer performing *locums* work was brought up at the provider meeting whereupon Dr. Huber and Meyer became extremely angry and attacked Dr. McAleer's character, professionalism, trustworthiness, and abilities as a mother.

32.     The personal attacks by Dr. Huber and Meyer were so bad that they drove Dr. McAleer to tears.

33.     From that point on, Dr. Huber acted as if she had a personal vendetta against Dr. McAleer and began a campaign to drive her out of the practice.

34.     Right after the August 2019 incident, Dr. McAleer had three cases referred to the MPRC – the very same peer review committee that Dr. Huber chaired.

35.   Dr. Huber was responsible for personally referring two of the three cases to the Quality Control Department, and was also a treating physician and/or a fact witness in all three cases.

36.   Dr. McAleer felt Dr. Huber was harassing her and bringing cases against her in retaliation for the August 22nd incident.

37.   It has since come to light that Dr. McAleer's fears were justified as Dr. Huber did in fact have a personal grudge against Dr. McAleer:

  a.  Dr. Huber told another doctor in the practice later that August that she wanted to get Dr. McAleer fired because she didn't trust her and didn't want to practice with her;

  b.  Dr. Huber began "strip stalking" Dr. McAleer trying to find cases she could refer to the MPRC;

  c.  Dr. Huber became very hostile towards Dr. McAleer after the August 22nd incident and began to treat Dr. McAleer differently and in an inappropriate and unprofessional manner;

  d.  Another doctor in the practice expressed her concerns about Dr. Huber's treatment of Dr. McAleer to the OB/GYN Section Chair; and

  e.  Dr. McAleer became so concerned with Dr. Huber's conduct that she asked the OB/GYN Section Chair if they were trying to fire her or force her to quit.

38.   Dr. Huber's conflict with Dr. McAleer reached its zenith when Dr. Huber physically shoved Dr. McAleer in the office, which resulted in Dr. Huber moving from the office "pod" she shared with Dr. McAleer to an empty exam room to avoid any interactions with Dr. McAleer.

39.     Despite Dr. Huber's conflict with Dr. McAleer, Dr. Huber did not disclose her personal conflict with Dr. McAleer to the members of the MPRC or the MEC, Dr. Huber did not recuse herself from Dr. McAleer's peer review matters before the MPRC or the MEC investigations of Dr. McAleer, and neither the MPRC nor the MEC conducted a formal investigation of Dr. Huber's conflict of interest with Dr. McAleer.

**THE FIRST THREE PEER REVIEW MATTERS AND THE IMPLEMENTATION OF THE FOCUSED PROFESSIONAL PRACTICE EVALUATION**

40.     On August 15, 2019, the MPRC conducted an initial peer review of one of Dr. McAleer's patients and determined that her treatment deviated from the standard of care ("Patient No. 1").

41.     On August 20, 2019, the MPRC sent Dr. McAleer a letter providing notice of the peer review matter regarding the treatment of Patient No. 1 and requested Dr. McAleer to respond to the allegations in writing on or before September 9, 2019.

42.     Dr. McAleer timely submitted a written response to the allegations and provided information and documentation showing her treatment of Patient No. 1 was within the standard of care.

43.     Dr. McAleer would not receive any further information regarding the peer review of Patient No. 1 until nearly six months later when the MPRC would send a letter dated February 21, 2020 notifying her that the external peer reviewer determined she had met the standard of care and the MPRC was closing the Patient No. 1 peer review file.

44.     Interestingly, this same notice was the first time Dr. McAleer even learned that the matter had been sent to an external peer reviewer, let alone that the review resulted in no findings and a closed case.

45.    However, the Patient No. 1 peer review would prove extremely detrimental to Dr. McAleer, despite the fact that there was no deviation from the standard of care, as the mere fact of its very existence would be used to support the FPPE, the Summary Suspension, the Formal Corrective Action Investigation, and the Corrective Action.

46.    Moreover, Dr. McAleer would be denied the opportunity to respond to the Patient No. 1 External Peer Review Report, which would become important later on in the MEC investigation and findings.

47.    In September 2019, Dr. Huber referred two matters to the MPRC for review, one occurring on August 27, 2019 ("Patient No. 2") and the other occurring on August 29, 2019 ("Patient No. 3"), in which Dr. McAleer's notes indicated she conducted a physical examination of said patients before discharging them, but Dr. Huber believed Dr. McAleer had not actually conducted a physical examination and therefore her documentation was inaccurate.

48.    On September 24, 2019, the MPRC sent Dr. McAleer two letters: a letter providing notice of the peer review matter involving documentation issues with Patient No. 2 and requested Dr. McAleer to respond to the allegations in writing on or before October 7, 2019; and a letter providing notice of the peer review matter involving documentation issues with Patient No. 3 and requested Dr. McAleer to respond to the allegations in writing on or before October 7, 2019.

49.    Dr. McAleer timely submitted written responses to the documentation allegations regarding Patient No. 2 and Patient No. 3, indicating that the documentation issues were the result of her misunderstanding Wilson Health's documentation standards and confusion regarding Wilson Health's medical records software, and that she would ensure to correct the issue moving forward.

50. On October 24, 2019, the MPRC met and discussed the three peer review files involving Dr. McAleer:

   a. The MPRC decided to send the Patient No. 1 peer review matter to an outside peer reviewer to determine whether the treatment was within the standard of care; and

   b. The MPRC decided to informally resolve the Patient No. 2 and Patient No. 3 peer review matters by having two MPRC members meet with Dr. McAleer to discuss the documentation issues, explain Wilson Health documentation standards, and advise her where to go in the future should she have documentation or medical records software questions or issues.

51. On October 28, 2019, two members of the MPRC met with Dr. McAleer and discussed the documentation errors.

52. At this same meeting, Dr. McAleer indicated she feared she was being harassed and targeted by Dr. Huber as a result of their prior conflict and that Dr. Huber was using the peer review process in a vindictive manner.

53. On November 21, 2019, the MPRC met and determined that the documentation errors regarding Patient No. 2 and Patient No. 3 resulted from Dr. McAleer's lack of understanding of Wilson Health's standards of practice and inexperience with the medical record software.

54. As a result, the MPRC closed the Patient No. 2 and Patient No. 3 peer review matters and sent Dr. McAleer written notice of the peer review outcome, indicated that the peer review matters for Patient No. 2 and Patient No. 3 were closed, and that any future documentation issues would be escalated to the MEC.

55.     At this same meeting, the MPRC agreed for the second time to send the Patient No. 1 peer review matter to an external peer reviewer.

56.     Dr. McAleer's allegations of harassment and targeting against Dr. Huber are briefly referenced in the November 21st meeting minutes, but Dr. Huber did not disclose her personal conflict with Dr. McAleer, Dr. Huber did not recuse herself from the proceedings against Dr. McAleer, and the MPRC did not conduct an investigation regarding Dr. McAleer's allegations or a potential conflict of interest.

57.     On December 12, 2019, Dr. Huber presented a report to the MEC regarding the November 21st MPRC meeting and the three Dr. McAleer peer review matters.

58.     Neither Dr. Huber nor other MEC members aware of the issue disclosed or discussed Dr. Huber's personal conflict with Dr. McAleer.

59.     There is also no evidence that Dr. Huber recused herself from the MEC proceedings against Dr. McAleer or that the MEC conducted an investigation regarding Dr. McAleer's allegations or the potential conflict of interest.

60.     Despite the fact that the MPRC had informally resolved and official closed the Patient No. 2 and Patient No. 3 peer review matters, the members of the MEC, including Dr. Huber, voted to place Dr. McAleer on a six (6) month prospective Focused Professional Practice Evaluation ("FPPE") in order to review and monitor Dr. McAleer files for documentation issues.

61.     The MEC directed Dr. Huber and the MPRC to report back to the MEC regarding the outcome of the FPPE after the six (6) months expired – after the MEC's June 2020 meeting.

62.     Dr. Trygstad, the interim CMO of Wilson Health, a member of the MEC, and a member of the MPRC, sent Dr. McAleer a letter, dated December 16, 2019, indicating the following:

11

    a.  that the MPRC decided at the November 21st MPRC meeting to share the results of the Patient No. 2 and Patient No. 3 peer review investigations with the MEC at the December 12th MEC meeting; and

    b.  that as a result of the Patient No. 2 and Patient No. 3 peer review matters, the MEC decided to place Dr. McAleer on a FPPE for six (6) months to assess her documentation on a regular basis for concerns regarding accurate documentation.

63.    Although Dr. McAleer would never get an update regarding the status or outcome of the FPPE, the mere existence of the FPPE would be used as a weapon against Dr. McAleer and as retrospective justification for future actions taken by the MPRC and MEC.

64.    It is also noteworthy, that although the correspondence was dated December 16th, there is evidence the MEC failed to timely send the FPPE letter as Dr. McAleer would not receive the notice until nearly a month later January 13, 2020, and a mere ten-days before the MEC would summarily suspend her privileges.

**THE SUMMARY SUSPENSION**

65.    On December 19, 2019, a member of the MPRC conducted an initial peer review of a Dr. McAleer patient treated on October 17th ("Patient No. 4") for a medical records documentation error.

66.    The MPRC reviewer deemed the issue was a category 3 marginal deviation from the standard of care and sent it to the full MPRC committee for further review, this despite the fact that the reviewer determined the documentation issue was caused by a failure of the Dragon voice software to properly interpret/transcribe Dr. McAleer's audio notes into writing for the medical records.

67.  At the MPRC meeting that same date, the MPRC confirmed that the documentation issue in Patient No. 4's file was the result of a Dragon interpretation error and determined it would notify Dr. McAleer of the issue and close the Patient No. 4 peer review matter.

68.  On December 30, 2019, the MPRC sent Dr. McAleer a letter providing notice of the Patient No. 4 peer review matter, indicated that the MPRC determined the documentation error was the result of a Dragon software interpretation error, instructed Dr. McAleer to ensure she reviewed her charts for Dragon software interpretation errors prior to signing off on the notes, and indicated that the Patient No. 4 peer review matter was closed.

69.  The Patient No. 4 documentation issue should not have been referred to peer review as it was caused by faulty software interpretation.

70.  Even if the Patient No. 4 documentation issue was relevant to peer review, any such review of the matter should have been addressed through the existing FPPE designed to address documentation errors.

71.  Further, the Patient No. 4 documentation file would be improperly used by the MPRC and MEC in the future as a basis to issue the summary suspension, to initiate a formal corrective action investigation, and to take formal corrective action against Dr. Huber.

72.  On January 16, 2020, a member of the MPRC conducted an initial review of two files concerning patients treated by Dr. McAleer:

    a.  a pregnant patient treated on December 5, 2019 resulted in an incident report to the OB Quality Control team for standard of care concerns and then forwarded to the MPRC for peer review based upon the alleged failure to monitor a second baby, a baby that did not actually exist, while administering Pitocin and proceeding with delivery ("Patient No. 5"); and

13

b. a pregnant patient treated on December 15, 2019 sent to peer review for standard of care concerns based upon the alleged failure of Dr. McAleer to ensure the patient followed up for an ultrasound ("Patient No. 6").

73. Dr. Huber chaired a meeting of the MPRC that same day and considered the Patient No. 5 and Patient No. 6 peer review files.

74. As to Patient No. 5, the MPRC voted to forward the peer review matter to the MEC for its consideration.

75. As to Patient No. 6, the MPRC determined Dr. McAleer failed to ensure the patient follow-up for the ultrasound recommended by radiology one week post-surgery, and decided to provide written notice of the issue to Dr. McAleer and close the peer review case.

76. On January 18, 2020, the MPRC sent Dr. McAleer a letter providing notice of the Patient No. 6 peer review matter, instructed Dr. McAleer to review prior notes in patient charts to ensure they are receiving proper discharge orders, and indicated that the Patient No. 6 peer review matter was closed.

77. On January 22, 2020, the MEC held an Ad Hoc/Special Meeting to discuss the past and present peer review matters involving Dr. McAleer and determine whether to take additional informal or formal action against her.

78. Dr. Huber, without disclosing her personal conflict with Dr. McAleer and without recusing herself from the presentations, discussions, and/or voting, gave a presentation to the MEC regarding the six MPRC peer review matters involving Dr. McAleer.

79. The MEC relied entirely upon Dr. Huber's presentation of the cases and did not actually review the full peer review files and patient medical records.

80. The MEC decided to summarily suspend Dr. McAleer's obstetrics privileges and her gynecology privileges on pregnant patients and conduct a formal corrective action investigation into past and present peer review matters involving Dr. McAleer.

81. Prior to issuing the summary suspension, the MEC determined that Dr. McAleer would be given the choice to voluntarily agree not to exercise her obstetrics privileges and her gynecology privileges on pregnant patients pending the formal corrective action investigation.

82. The MEC directed Dr. Prenger, the Wilson Health Chief of Staff and the Chair of the MEC, and Dr. McDevitt, a voting member of the MEC, to meet with Dr. McAleer the following day to present the options to her, and to immediately impose summary suspension if she refused to voluntarily agree not to exercise her obstetrics privileges and her gynecology privileges on pregnant patients while the investigation was conducted.

83. The MEC formed an Ad Hoc Investigative Committee composed of Drs. Melisa Mekesa - Chair, Robert McDevitt, and Kristi Pedler to conduct the formal corrective action investigation of Dr. McAleer.

84. On January 23, 2020, Drs. Prenger and McDevitt met with Dr. McAleer to explain the MEC's decision to begin a formal corrective action investigation and to present her options on summary suspension of her obstetrics and gynecological privileges.

85. Drs. Prenger and McDevitt hand-delivered a Notice of Formal Corrective Action Investigation, a Notice of Summary Suspension of All Obstetrics Privileges and Partial Gynecology Privileges, and a proposed Voluntary Agreement not to Exercise Privileges.

15

86. Drs. Prenger and McDevitt told Dr. McAleer that the formal corrective action investigation would be conducted timely and diligently, and the whole process would be completed within 3 to 4 weeks.

87. Drs. Prenger and McDevitt gave Dr. McAleer a deadline of 5:00 pm that evening to agree to the terms of Voluntary Suspension, or the MEC would move forward with the Summary Suspension.

88. Dr. McAleer was willing to agree to the Voluntary Suspension, but Wilson Health refused to allow her to voluntarily suspend exercising of her privileges during the formal corrective action investigation unless she also agreed to waive her Article XIII due process and hearing rights.

89. As a result, Dr. McAleer refused to sign the Voluntary Suspension Letter or the Summary Suspension Letter, and the MEC implemented the Summary Suspension effective January 23, 2020.

90. Dr. Prenger sent Dr. McAleer a Notice of Adverse Action/Right to Hearing letter, dated February 11, 2020, informing her that the MEC's action against her was now deemed adverse pursuant to Article 13.3 of the Bylaws because the summary suspension had remained in place for more than 14-days, and provided Dr. McAleer with notice of her Article 13 due process and hearing rights.

91. In early March 2020, Wilson Health sent reports to the National Practitioner Data Bank and the State Medical Board of Ohio regarding the summary suspension.

92. Dr. McAleer timely submitted a written request for an administrative hearing as to the Summary Suspension via a letter dated February 21, 2020.

93.   In the meantime, the MEC Ad Hoc Investigative Subcommittee conducted its formal corrective action investigation of Dr. McAleer.

94.   The Investigative Subcommittee issued its Report and Recommendation, dated March 5, 2020, to the MEC and recommended that formal corrective action be taken against Dr. McAleer as follows: that Dr. McAleer be required to complete approved AMA courses in ethics and documentation; that Dr. McAleer be placed on a 4 to 6 month obstetrics consultation plan with concurrent review of her care and medical records to ensure compliance; and that the summary suspension would be lifted once the consult requirement was put in place.

95.   The MEC met on March 12, 2020 to consider the Report and Recommendation of the Ad Hoc Subcommittee and adopted the following Formal Remediation Plan: that Dr. McAleer complete AMA approved courses in ethics and documentation in 60-days; that Dr. McAleer be placed on a 6 month consultation requirement when caring for obstetrical patients and pregnant gynecological patients, with concurrent review of her medical records to ensure compliance; that summary suspension be lifted as soon as the consult plan implemented; and that the MEC would then review the matter at the end of the 6 month period to decide whether to remove the consult requirement or take further action.

96.   Dr. McAleer was provided a written Notice of Adverse Recommendation of the MEC, dated March 16, 2020, which stated that the MEC would recommend the Wilson Health Board adopt the proposed Formal Remediation Plan, that the MEC's recommendation was deemed adverse pursuant to Article XIII of the Bylaws, and provided notice of Dr. McAleer's due process and hearing rights under the Bylaws.

97. Dr. McAleer timely submitted a written request for an administrative hearing as to the Corrective Action via a letter dated March 18, 2020.

98. On June 11, 2020, the MEC met to review the outcome of the MPRC's peer review of Patient No. 5, which found that there was a significant deviation from the standard of care.

99. This finding would later be challenged by an expert witness that found Dr. McAleer had not violated the standard of care in her treatment of Patient No. 5, nor any of the other five peer review files reviewed by the MPRC and/or MEC.

100. The MEC sent Dr. McAleer a Supplemental Notice of Adverse Recommendation, dated June 11, 2020, which provided the findings of the Patient No. 5 peer review, stated that the MEC incorporated said findings into the March 16th Corrective Action, and that the matter would be heard as part of Dr. McAleer's Corrective Action hearing.

101. Despite Dr. McAleer's objections, the MEC decided to combine the administrative hearings for the Summary Suspension, the Corrective Action, and the Supplemental Corrective action into a single administrative hearing before a hearing officer, which took place over the course of five-days in late July and early August 2020.

102. The Hearing Officer's Report and Recommendation found in favor of Wilson Health and upheld the Summary Suspension and the Corrective Action.

103. Dr. McAleer timely sent written notice to the Wilson Health Board of Trustees to Request Appellate Review pursuant to Sections 13.9 and 13.10 of the Wilson Health Bylaws.

104. The Wilson Health Board of Trustees denied Dr. McAleer's Appeal and adopted the MEC's Formal Remediation Plan.

## IV.    LEGAL CLAIMS

### COUNT ONE
### COMBINATION AND CONSPIRACY IN RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT AGAINST ALL DEFENDANTS

105.    Plaintiff incorporates each of the proceeding allegations within this Count by reference.

106.    Dr. McAleer was a successful OB/GYN who brought many patients with her to Wilson Health and WHMG.

107.    Dr. Huber was a direct competitor of Dr. McAleer.

108.    Upon information and belief, Dr. Huber intentionally engaged in actions to specifically sabotage Dr. McAleer for monetary reasons.

109.    Defendants engaged in verbal contract, combination, conspiracy, and/or concerted action by committing to a common scheme with an illegal objective to eliminate Dr. McAleer as a competitor in violation of federal anti-trust laws.

110.    Defendants' unlawful actions in furtherance of their verbal contract, combination, conspiracy with concerted action to achieve an illegal objective to eliminate Plaintiff as a competitor, reduce competition, reduce quality have caused irreparable harm and damage to Dr. McAleer, to patients in the marketplace and to interstate commerce.

111.    Based upon the foregoing, Dr. McAleer is entitled to compensatory damages, punitive damages, special damages, treble damages, and the recovery of her costs, expenses, and attorney fees incurred herein.

### COUNT TWO
### VIOLATIONS OF 18 U.S.C. § 1342 and 18 U.S.C. § 1964(c)

112.    Plaintiff incorporates each of the proceeding allegations within this Count by reference.

113.    Wilson Health is an association-in-fact "enterprise" ("the Wilson Health Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

114.    The Defendants have knowingly conducted and/ or participated, directly or indirectly, in the conduct of the Wilson Health Enterprise through a pattern of racketeering activity consisting of repeated violation of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States Mail to supply false information related to the professional competence of Plaintiff through the date of this Complaint.

115.    Plaintiff has been injured by reason of the Defendants' conduct in that permanently defamed and ruined Plaintiff's reputation based upon false information.

116.    By reason of their injury, Plaintiff is entitled to treble damages, costs and reasonable attorney fees pursuant to 18 U.S.C. 1964(c) and any other relief the Court deems just and proper.

### COUNT THREE
### VIOLATIONS OF 18 U.S.C. § 1962(d)

117.    Plaintiff incorporates each of the proceeding allegations within this Count by reference.

118.    Wilson Health is an association-in-fact "enterprise" ("the Wilson Health Enterprise") as that term is defined in 18 U.S.C. Section 1961(4), that engages in, and the activities of which affect, interstate commerce.

119.    The Defendants have willfully combined, conspired and agreed to violate 18 U.S.C. 1962 (c) that is to conduct and/or participate, directly or indirectly, in the conduct of a pattern of racketeering, activity consisting of repeated violations of the federal mail fraud stated, 18 U.S.C. 1341, based upon the use of the United States mail to disseminate fraudulent information involving Plaintiffs professional competence.

120.    Each Defendant knew of and agreed to and acted in furtherance of the overall objective of the conspiracy to injure Plaintiff by facilitating the dissemination of false statements.

121.    By reason of their injury, Plaintiff is entitled to treble damages, costs and reasonable attorney fees pursuant to 18 U.S.C. 1964(c) and any other relief the Court deems just and proper.

## COUNT FOUR
## REQUEST FOR DECLARATORY RELIEF FOR VIOLATION OF THE HEALTH CARE QUALITY IMPROVEMENT ACT, 42 U.S.C. § 11111, ET SEQ.

122.    Plaintiff incorporates each of the proceeding allegations within this Count by reference.

123.    Section 11111(a) of The Health Care Quality Improvement Act ("HCQIA") provides immunity to hospitals and doctors for damages allegedly arising from a professional review action as long as the standards for professional review actions set out in Section 11112 are followed.

124.    In order to enjoy the immunity afforded by the HCQIA, a professional review action must be taken: 1) in the reasonable belief that the action was in furtherance of quality health care; 2) after reasonable effort to obtain the facts of the matter; 3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and 4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtains facts and after meeting the adequate notice and fair hearing provisions. 42 U.S.C. § 11112(a).

125.    The adequate notice and hearing requirements contained in Section 11112(a)(3) do not apply where there is no adverse professional review action taken, or when clinical privileges are suspended or restricted for a period of 14-days or less while an investigation is being conducted to determine the need for a professional review action.

126. The adequate notice and hearing requirements contained in Section 11112(a)(3) do not preclude an immediate suspension or restriction of clinical privileges without such due process where the failure to take such action may result in an imminent danger to the health of any individual.

127. Defendants are not entitled to immunity as to Dr. McAleer's claims because to Defendants' peer review activities were not taken in the reasonable belief that the action was in furtherance of quality health care.

128. Defendants are not entitled to immunity as to Dr. McAleer's claims because to Defendants' peer review activities were not taken after reasonable efforts to obtain the facts of the matter.

129. Defendants are not entitled to immunity as to Dr. McAleer's claims because to Defendants' peer review activities were taken without adequate notice and hearing procedures.

130. Defendants failed to satisfy the adequate notice and hearing safe harbor provisions contained in Section 11112(a)(3) as Defendants: repeatedly failed to give Dr. McAleer notice that a professional review action had been proposed to be taken against her; repeatedly failed to give Dr. McAleer notice of the reason for the proposed action; and repeatedly failed to provide notice of Dr. McAleer's hearing and due process rights.

131. Defendants are not entitled to immunity as to Dr. McAleer's claims because to Defendants' peer review activities were not taken in the reasonable belief that the action warranted by the facts known after such reasonable effort to obtain facts and after meeting the adequate notice and fair hearing provisions.

132.   Defendants are not entitled to immunity as to Dr. McAleer's claims because Defendants implemented the FPPE, an FPPE which constituted an adverse action under the Wilson Health Bylaws, without notice, hearing, and/or due process.

133.   Defendants are not entitled to immunity as to Dr. McAleer's claims because Defendants implemented the Summary Suspension of Dr. McAleer's clinical privileges without notice, hearing, and/or due process even though they failed to meet the imminent danger standard.

134.   Based upon the foregoing, Plaintiff is entitled to an Order declaring that Defendants acts and omissions violated the Health Care Quality Improvement Act and are not entitled to immunity thereunder.

**COUNT FIVE**
**BREACH OF MEDICAL STAFF PEER REVIEW POLICY**

135.   Plaintiff incorporates each of the proceeding allegations within this Count by reference.

136.   Defendants breached Section III(C)(3) of the Policy by failing to conduct Peer Review activities related to Dr. McAleer in a fair, impartial, and appropriate manner, and by failing to perform Peer Review activities in good faith and without bias, prejudice, personal gain, and/or malice.

137.   Defendants breached Section III(C)(3) of the Policy by failing to perform Peer Review activities related to Dr. McAleer in good faith and without bias, prejudice, personal gain, and/or malice.

138.   Defendants breached the Policy and the Memorandum of Understanding and Statement of Confidentiality, attached as Addendum A to the Policy (the "Memorandum of Understanding"), by failing to keep deliberations concerning Dr. McAleer frank, honest, accurate, unbiased, and non-inflammatory, by using the Peer Review process to discredit,

embarrass, undermine, discourage, and/or unseat Dr. McAleer, and/or via the bias selection of Peer Review cases opened against Dr. McAleer.

139.  Dr. Huber breached the Policy and the Memorandum of Understanding by failing to timely and fully disclose her conflict of interest with Dr. McAleer to the MEC and/or the MPRC and failing to recuse herself from matters regarding Dr. McAleer.

140.  Defendants breached the Policy and the Memorandum of Understanding by failing to timely and fully investigate Dr. Huber's conflict of interest with Dr. McAleer, relying on information provided by Dr. Huber relating to Peer Review matters involving Dr. McAleer, and failing to require Dr. Huber to recuse herself from all involvement in MEC and MPRC matters involving Dr. McAleer.

141.  Defendants breached the Policy and the Peer Review Case Processing outlined in Addendum B of the Policy, by engaging in additional peer review activities, conducting corrective action investigations, and taking formal corrective and/or adverse action against Dr. McAleer after the MPRC had issued final peer review determinations and officially closed peer review matters against Dr. McAleer.

142.  Defendants breached Section VI(G)(1) of the Policy by failing to follow up with the external peer reviewer by letter or conversation regarding their concerns about Dr. McAleer's treatment of Patient No. 1 in light of the fact that Wilson Health was a Level 1 maternity hospital.

143.  Defendants breached Section VI(G)(2) of the Policy by denying Dr. McAleer the opportunity to review, respond, or rebut any findings or factual statements of the Patient No. 1 External Peer Review Report.

144. Defendants breached Section VI(G)(3) of the Policy by using the Patient No. 1 Peer Review matter as a basis for the Summary Suspension, the formal corrective action investigation, and for taking formal corrective action against Dr. McAleer, where it was found that Dr. McAleer had not deviated from the standard of care in her treatment of Patient No. 1 and the Patient No. 1 peer review matter was closed.

145. Defendants breached Section I of the Policy and the underlying purpose of the Peer Review process by failing to conduct the Patient No. 1 Peer Review matter in a diligent and timely manner, which resulted in undue prejudice and direct harm to Dr. McAleer.

146. Defendants breached Section VI of the Policy by failing to implement a FPPE for Dr. McAleer at the time her privileges were granted and by failing to address any standard of care, quality, or documentation concerns involving Dr. McAleer through said FPPE for physicians with newly granted privileges.

147. Defendants breached Section VI(E)(3) of the Policy by failing to timely notify Dr. McAleer in writing of the FPPE issued on December 12, 2020.

148. Defendants breached Section VI(E)(4) of the Policy by failing to meet with Dr. McAleer to review the reason for the FPPE and discuss its scope and implementation.

149. Defendants breached Section VI of the Policy by failing to properly implement and manage the FPPE after it was issued.

150. Defendants breached Section VI of the Policy by reviewing cases under the peer review process and/or formal corrective action investigation instead of the FPPE after it was issued.

151. Defendants breached Section 2 of the Policy by failing to conduct the corrective action investigation in a timely manner.

152.    Defendants breached the Policy by directing Dr. Huber to conduct a clandestine fetal demise investigation of Dr. McAleer's WHMG patients outside the bounds of the Policy and/or Bylaws.

153.    Defendants breached the Policy by discussing MPRC and MEC matters involving Dr. McAleer with third-parties outside of the peer review, corrective action investigation, and/or formal corrective action process.

154.    Defendants breached the Policy by denying Dr. McAleer due process during the peer review process, failing to substantially comply with Wilson Health regulations and policies, and abused their discretion by applying such regulations and policies against Dr. McAleer in an unreasonable, arbitrary, and/or discriminatory manner.

155.    Based upon the foregoing, Dr. McAleer is entitled to compensatory damages in an amount to be determined at trial, plus interest, and costs and attorney fees incurred herein.

### COUNT SIX
### BREACH OF MEDICAL STAFF BYLAWS

156.    Plaintiff incorporates each of the proceeding allegations within this Count by reference.

157.    Dr. Huber breached Section 3.2 of the Bylaws by failing to disclose and/or fully disclose her conflict of interest with Dr. McAleer to the MPRC and/or the MEC.

158.    Defendants breached Section 3.2 of the Bylaws by failing to investigate whether Dr. Huber had a conflict of interest with Dr. McAleer and, if so, whether Dr. Huber should have been precluded from participating in MPRC and MEC proceedings against Dr. McAleer.

159.    Defendants breached Sections 12.2(e)(i) and 12.2(f)(iii) of the Bylaws by failing to conduct a corrective action investigation prior to placing Dr. McAleer on a FPPE December 12, 2019.

160. Defendants breached Articles XII and XIII of the Bylaws when it took adverse action against Dr. McAleer by placing her on a non-routine FPPE, but failed to provide her with Special Notice of the Adverse Action and failed to provide her with notice of her due process and hearing rights.

161. Defendants breached Article XIII of the Bylaws by denying Dr. McAleer any and all due process as to the FPPE.

162. Defendants breached Section 10.3(c) of the Bylaws by holding the January 22, 2020 Special Meeting of the MEC because they lacked the required number of voting members to constitute a quorum.

163. Defendants breached Section 10.7(b) of the Bylaws by taking action against Dr. McAleer at the January 22, 2020 Special Meeting without the approval of a majority of the voting members present and in good standing at the meeting and without a quorum.

164. Defendants breached Section 12.3(a) of the Bylaws by summarily suspending Dr. McAleer's privileges where her conduct was not of such a nature as to require immediate action to protect, or to reduce the substantial likelihood of injury or imminent danger to life, health, or safety of any individual at Wilson Health.

165. Defendants decision to summarily suspend Dr. McAleer's privileges constitutes an abuse of discretion and was arbitrary, unreasonable, and/or discriminatory.

166. Defendants breached the Bylaws by failing to conduct a diligent and complete investigation into Dr. McAleer before it issued the summary suspension.

167. Defendants failed to timely provide Dr. McAleer the required Special Notices regarding the Summary Suspension in violation of Sections 12.3(b) and (e) of the Bylaws.

168.   Defendants breached the Bylaws and abused its discretion by refusing to allow Dr. McAleer to accept the voluntary summary suspension plan unless she waived her Article XIII due process and hearing rights.

169.   Defendants breached Section 12.2(e)(iii) of the Bylaws by failing to conduct the corrective action investigation in a "prompt manner".

170.   Defendants denied Dr. McAleer due process, violated the Bylaws, and committed an abuse of discretion through its handling of the investigation and decision in the Patient No. 5 matter.

171.   Defendants breached the Bylaws by failing to conduct a diligent and complete formal investigation before it issued the Formal Corrective Action/Remediation Plan.

172.   Defendants Notice of Adverse Recommendation, dated March 16, 2020, was deficient and in violation of the Bylaws because it failed to concisely and adequately describe the proposed Remediation Plan in order to allow Dr. McAleer to make an informed decision.

173.   Defendants decision to supplement the adverse recommendation via the Supplemental Notice of Adverse Recommendation, dated June 11, 2020, three months after concluding its investigation and issuing the Adverse Recommendation and mere weeks before the administrative hearing constitutes a denial of Dr. McAleer's due process rights, a breach of the Bylaws, and an abuse of discretion.

174.   Defendants denied Dr. McAleer due process, violated the Bylaws, and abused its discretion by refusing to allow Dr. McAleer to accept the Formal Remediation Plan unless she agreed to waive her due process and hearing rights.

175.   Defendants violated the Bylaws and abused its discretion by taking Formal Corrective Action against Dr. McAleer without a valid basis.

176.    Based upon the foregoing, Dr. McAleer is entitled to compensatory damages in an amount
to be determined at trial, plus interest, and costs and attorney fees incurred herein.

**COUNT SEVEN**
**BREACH OF THE DUTIES OF DILIGENCE, CARE, GOOD FAITH,**
**AND FAIR DEALING**

177.    Plaintiff incorporates each of the proceeding allegations within this Count by reference.

178.    Defendants owed Dr. McAleer the duties of due diligence, care, good faith, and fair dealing
in  carrying out their peer review and medical privilege functions in accordance with the
Medical Staff Peer Review Policy and the Medical Staff Bylaws.

179.    Defendants breached their duties of diligence, care, good faith, and fair dealing by:

   a.    conducting peer review in a confrontational, adversarial, and punitive manner,
rather than within the intent and spirit of the Policy and Bylaws that clearly
articulated that the peer review process was intended to be educational and address
patient care issues quickly and informally;

   b.    failing to conduct the peer review process in a clearly defined, objective, timely,
and useful manner;

   c.    usurping the investigative and professional review authority powers delegated
solely to the MEC and/or Board and eschewing informal resolution and education;

   d.    reopening peer review cases informally resolved and closed by the MPRC and/or
the WHMG and then using those cases as a basis to implement the FPPE, issue the
Summary Suspension, launch Formal Corrective Action Investigation, and take
Formal Corrective Action against Dr. McAleer;

    e.  failing to properly, timely, and diligently investigate the conflict of interest issues raised early on in the peer review process and failing to recuse Dr. Huber from all MPRC and/or MEC matters involving Dr. McAleer; and

    f.  failing to perform the peer review of Dr. McAleer with the necessary care and diligence demanded of the process and the specific facts of each file before them.

180.  Defendants breached their duties of diligence, care, good faith, and fair dealing with actual malice and/or reckless disregard to the rights of Dr. McAleer.

181.  As a result of the breaches, Dr. McAleer is entitled to compensatory damages, punitive damages, special damages, and the recovery of her costs, expenses, and attorney fees incurred herein.

**COUNT EIGHT**
**TORTIOUS INTERFERENCE WITH CONTRACT**

182.  Plaintiff incorporates each of the proceeding allegations within this Count by reference.

183.  Dr. McAleer was party to contracts with WHMG and Wilson Health relating to her employment and hospital privileges.

184.  Dr. Huber was aware of the existence of Dr. McAleer's contracts with WHMG and Wilson Health.

185.  Dr. Huber's conduct was taken with the intention of interfering with, or procuring the breach of, Dr. McAleer's contracts with WHMG and/or Wilson Health.

186.  Dr. Huber's tortious conduct was without justification and resulted in damages to Dr. McAleer.

187.  Based upon the foregoing, Dr. McAleer is entitled to compensatory damages, punitive damages, and special damages in an amount to be determined at trial, plus interest, and costs and attorney fees incurred herein.

30

## COUNT NINE
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

188.   Plaintiff incorporates each of the proceeding allegations within this Count by reference.

189.   Dr. McAleer was engaged in a business relationship and/or a prospective business relationship with a third-party.

190.   Dr. Huber was aware of the existence of Dr. McAleer's business relationship and/or prospective business relationship with the third-party.

191.   Dr. Huber's conduct was taken with the intention of interfering with, procuring the breach of, or terminating Dr. McAleer's business relationship and/or prospective business relationship with the third-party.

192.   Dr. Huber's tortious conduct was without justification and resulted in damages to Dr. McAleer.

193.   Based upon the foregoing, Dr. McAleer is entitled to compensatory damages, punitive damages, and special damages in an amount to be determined at trial, plus interest, and costs and attorney fees incurred herein.

## COUNT TEN
### TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP

194.   Plaintiff incorporates each of the proceeding allegations within this Count by reference.

195.   Dr. McAleer is an employee of WHMG and has privileges at Wilson Health.

196.   Dr. Huber was aware of Dr. McAleer's employment relationships with WHMG and Wilson Health.

197.   Dr. Huber intentionally interfered with Dr. McAleer's employment relationship with WHMG and Wilson Health.

198.   Dr. McAleer was injured as a proximate result of Dr. Huber's actions.

31

199.   Based upon the foregoing, Dr. McAleer is entitled to compensatory damages, punitive damages, and special damages in an amount to be determined at trial, plus interest, and costs and attorney fees incurred herein.

## COUNT ELEVEN
### DEFAMATION AND/OR DEFAMATION *PER SE*

200.   Plaintiff incorporates each of the proceeding allegations within this Count by reference.

201.   Defendants made false and defamatory statements about Dr. McAleer.

202.   Defendants' false and defamatory statements about Dr. McAleer were published without privilege to a third-party.

203.   Defendants' false and defamatory statements about Dr. McAleer were made and published with actual malice and/or negligence.

204.   Defendants' actions were either defamatory *per se* or caused special harm to Dr. McAleer.

205.   Based upon the foregoing, Dr. McAleer is entitled to compensatory damages, punitive damages, and special damages in an amount to be determined at trial, plus interest, and costs and attorney fees incurred herein.

## COUNT TWELVE
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

206.   Plaintiff incorporates each of the proceeding allegations within this Count by reference.

207.   Defendants' conduct towards Dr. McAleer was intended to cause Dr. McAleer serious emotional distress.

208.   Defendants' conduct towards Dr. McAleer was extreme and outrageous.

209.   Dr. McAleer has suffered and continues to suffer serious emotional distress.

210.   Defendants' conduct towards Dr. McAleer was and is the proximate cause of her serious emotional distress.

211. Based upon the foregoing, Dr. McAleer is entitled to compensatory damages, punitive damages, and special damages in an amount to be determined at trial, plus interest, and costs and attorney fees incurred herein.

**COUNT THIRTEEN**
**DECLARATORY JUDGMENT**

212. Plaintiff incorporates each of the proceeding allegations within this Count by reference.

213. Courts may declare rights, status, and other legal relations whether or not further relief is or could be claimed, and such declaration has the effect of a final judgment or decree pursuant to R.C. § 2721.01, et seq.

214. Moreover, any person interested under a written contract or other writing constituting a contract may have determined any question of construction or validity arising under the instrument or contract and obtain a declaration of rights, status, or other legal relations under it pursuant to R.C. § 2721.01, et seq.

215. Dr. McAleer is entitled to an order declaring that Defendants are not entitled to immunity as to her claims under the Health Care Quality Improvement Act because Defendants' peer review activities were: not taken in the reasonable belief that the action was in furtherance of quality health care; not taken after reasonable efforts to obtain the facts of the matter; not taken with adequate notice and hearing procedures; and not taken in the reasonable belief that the action warranted by the facts known after such reasonable effort to obtain facts and after meeting the adequate notice and fair hearing provisions.

216. Dr. McAleer is entitled to an order declaring that Defendants peer review activities involving her, including, but not limited to, MPRC activities, MEC activities, the FPPE, the Summary Suspension, the Formal Corrective Action Investigation, and the Formal Corrective Action/Remediation Plan, constituted a material breach of the Medical Staff

Peer Review Policy and the Medical Staff Bylaws, denied Dr. McAleer due process, and constituted an abuse of discretion.

217. Dr. McAleer is entitled to an order declaring that the FPPE was implemented in violation of the Policy and Bylaws, and, therefore, the FPPE is invalid and void.

218. Dr. McAleer is entitled to an order declaring that the Summary Suspension was implemented in violation of the Policy and Bylaws, and, therefore, the Summary Suspension is invalid and void.

219. Dr. McAleer is entitled to an order declaring that the Formal Corrective Action Investigation was launched in violation of the Policy and Bylaws, and, therefore, the Formal Corrective Action Investigation is invalid and void.

220. Dr. McAleer is entitled to an order declaring that the Formal Corrective Action and/or Formal Remediation Plan violated the Policy and Bylaws, and, therefore, the Formal Corrective Action and/or Formal Remediation Plan are invalid and void.

## COUNT FOURTEEN
### INJUNCTIVE RELIEF

221. Plaintiff incorporates each of the proceeding allegations within this Count by reference.

222. The Defendants peer review activities involving Dr. McAleer, including, but not limited to, MPRC activities, MEC activities, the FPPE, the Summary Suspension, the Formal Corrective Action Investigation, and the Formal Corrective Action/Remediation Plan, constituted a material breach of the Medical Staff Peer Review Policy and the Medical Staff Bylaws, violated the Health Care Quality Improvement Act, denied Dr. McAleer due process, and constituted an abuse of discretion.

223. As a result of Defendants' conduct and said breaches, Dr. McAleer has no adequate remedy at law and will suffer irreparable injury absent injunctive relief:

a.  requiring Defendants to rescind the FPPE, the Summary Suspension, and the Formal Corrective Action/Remediation Plan, and reinstate Dr. McAleer's full privileges at Wilson Health;

b.  requiring Defendants to submit updated reporting to the State Medical Board of Ohio and the National Practitioner Data Bank;

c.  precluding Defendants from taking any further investigative or punitive action against Dr. McAleer under the Policy or Bylaws relating to peer review, employment, or clinical or hospital privileges;

d.  precluding Defendants from reporting or publishing inaccurate, false, misleading, and/or defamatory statements to third-parties including, but not limited to, physicians, staff, employees, patients, hospitals, healthcare providers, medical practices, potential employers, business interests, the State Medical Board of Ohio, or the National Practitioner Data Bank, regarding Dr. McAleer, Dr. McAleer's skills and abilities as a physician, Dr. McAleer's employment with WHMG, and/or Dr. McAleer's privileges at Wilson Health.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, Amanda McAleer, M.D., demands judgment against Defendants, and requests the following relief and damages:

a.  As to Count Four of Plaintiff's Complaint, a declaration that Defendants failed to comply with the requirements of the Health Care Quality Improvement Act, and, therefore, Defendants' peer review activities are not entitled to immunity thereunder;

b.  As to Count Thirteen of Plaintiff's Complaint, an Order granting declaratory relief as follows:

i.    declaring that Defendants are not entitled to immunity as to Plaintiff's claims under the Health Care Quality Improvement Act because Defendants' peer review activities were: not taken in the reasonable belief that the action was in furtherance of quality health care; not taken after reasonable efforts to obtain the facts of the matter; not taken with adequate notice and hearing procedures; and not taken in the reasonable belief that the action warranted by the facts known after such reasonable effort to obtain facts and after meeting the adequate notice and fair hearing provisions;

ii.   declaring that Defendants peer review activities involving Plaintiff, including, but not limited to, MPRC activities, MEC activities, the FPPE, the Summary Suspension, the Formal Corrective Action Investigation, and the Formal Corrective Action/Remediation Plan constituted a material breach of the Medical Staff Peer Review Policy and the Medical Staff Bylaws, denied Plaintiff due process, and constituted an abuse of discretion;

iii.  declaring that the FPPE was implemented in violation of the Policy and Bylaws, and, therefore, the FPPE is invalid and void;

iv.   declaring that the Summary Suspension was implemented in violation of the Policy and Bylaws, and, therefore, the Summary Suspension is invalid and void;

v.    declaring that the Formal Corrective Action Investigation was launched in violation of the Policy and Bylaws, and, therefore, the Formal Corrective Action Investigation is invalid and void; and

        vi.    declaring that the Formal Corrective Action and/or Formal Remediation Plan violated the Policy and Bylaws, and, therefore, the Formal Corrective Action and/or Formal Remediation Plan are invalid and void;

c.  As to Count Fourteen of Plaintiff's Complaint, injunctive relief as follows:

        i.    requiring Defendants to rescind the FPPE, the Summary Suspension, and the Formal Corrective Action/Remediation Plan, and reinstate Plaintiff's full privileges at Wilson Health;

        ii.    requiring Defendants to submit updated reporting to the State Medical Board of Ohio and the National Practitioner Data Bank;

        iii.    precluding Defendants from taking any further investigative or punitive action against Plaintiff under the Policy or Bylaws relating to peer review, employment, or clinical or hospital privileges; and

        iv.    precluding Defendants from reporting or publishing inaccurate, false, misleading, and/or defamatory statements to third-parties including, but not limited to, physicians, staff, employees, patients, hospitals, healthcare providers, medical practices, potential employers, business interests, the State Medical Board of Ohio, or the National Practitioner Data Bank, regarding Plaintiff, Plaintiff's skills and abilities as a physician, Plaintiff's employment with WHMG, and/or Plaintiff's privileges at Wilson Health;

d.  Compensatory damages in an amount in excess of $1,000,000.00 to be determined at trial;

e.  Pre-judgment and post-judgment interest;

f.  Punitive damages;

g. Special damages;

h. Treble damages;

i. Plaintiffs' cost, expenses, and reasonable attorney fees incurred in this litigation; and

j. Any other legal and/or equitable relief deemed appropriate by this Court.

Respectfully Submitted,

Craig J. Spadafore (0081279)
Eric A. Jones (0081670)
Nicholas Kolitsos (0095938)
Jones Law Group, LLC
513 E. Rich Street
Columbus, Ohio 43215
Phone: 614.545.9998
Fax: 614.573.8690
Email: cspadafore@joneslg.com
Attorney for Plaintiff

## JURY DEMAND

Plaintiff hereby requests a jury of eight (8) on all triable issues of fact.

Craig J. Spadafore (0081279)
Eric A. Jones (0081670)
Nicholas Kolitsos (0095938)